## 0007

Elizabeth BARON, Appellant, v. Royce Arol DYSLIN and Tamara Erin
Dyslin, an Infant under the Age of Fourteen Years, Respondents.

(309 S. E. (2d) 767)

Court of Appeals

*David R. Gravely* of *Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers,* Myrtle Beach, *for appellant.*

*John R. Clarke,* North Myrtle Beach, and *John L. Sherrill* of *Kelaher & Sherrill,* Surfside Beach, *for respondents.*

Nov. 28, 1983.

GOOLSBY, Judge:

The appellant Elizabeth Baron appeals the family court's finding that the respondent Royce Arol Dyslin (Dyslin) is not the father of her minor child, the respondent Tamara Erin Dyslin. She also appeals the lower court's denial of child support. We reverse and remand the case to the family court.

Because this is an equity action tried by the family court judge alone without a reference, the Court of Appeals has jurisdiction to find facts in accordance with its views of the preponderance of the evidence. *South Carolina Department of Social Services v. Johnson,* 275 S. C. 7, 266 S. E. (2d) 878 (1980); *Townes Associates, Ltd. v. City of Greenville,* 266 S. C. 81, 221 S. E. (2d) 773 (1976). In a case such as this, the Court of Appeals may reverse a factual finding if the appellant convinces the court that the finding is against the greater weight of the evidence. *White v. Boseman,* 275 S. C. 184, 268 S. E. (2d) 287 (1980). The question of whether the family court finding challenged here should be reversed depends upon whether Dyslin carried his burden of proof in rebutting the mother's *prima facie* case of his paternity. *See Davis v. Holloway,* 274 S. C. 500, 265 S. E. (2d) 264 (1980).

As the lower court found, the mother established a *prima facie* case. We agree. The mother's evidence, among other things, consisted of her own testimony and the results of blood tests done in duplicate by two different technologists.

The mother testified that she did not have sexual relations with anyone other than Dyslin for about a year before her daughter was born, and she testified that her child, born on

October 20, 1979, was conceived on January 27, 1979, when Dyslin visited her in an Illinois apartment near Chicago.

The blood test results failed to exclude Dyslin as the child's father. Testing involving white cell antigens caused Dr. Petrina V. Genco, Director of the HLA Laboratory at the Medical University of South Carolina, to conclude that Dyslin "is likely to be the biologic father of the child in question;" and Dr. Albert Cannon, Director of the Medical University's Immunohematology Division, advised:

> A combination of the red cell and white cell antigen testing gives a cumulative probability of exclusion of at least 95 [per cent]. It must be realized that absolute proof of paternity cannot be established by any known blood test available. However, it must be appreciated that the likelihood of paternity is very high indeed if the laboratory performing the test has a test profile yielding a probability of exclusion at the 90 [per cent] level or higher and the results of the tests failed to obtain an exclusion. It is, therefore, my opinion that failure to exclude [Dyslin] at the 95th percentile or greater must be interpreted that the alleged father is very likely to be the biologic father of the child in question.

The family court held, however, that Dyslin rebutted the mother's *prima facie* case of paternity because (1) the birth certificate bore Dyslin's forged signature; (2) Dyslin lacked access to the mother during the gestation period; (3) Dyslin was not in the Chicago, Illinois, area when the mother conceived her daughter; (4) the mother dismissed without prejudice an earlier paternity action against Dyslin involving her daughter; (5) the mother dropped criminal charges preferred by her against Dyslin; (6) the mother instituted the instant action immediately after the dismissal of the criminal charges; (7) the mother caused two young boys to break into Dyslin's apartment; and (8) absolute proof of paternity cannot be established by any known blood test available.

We do not agree that Dyslin rebutted the mother's *prima facie* case. Evidence that the birth certificate bore Dyslin's forged signature, that a prior paternity action was dismissed without prejudice, that criminal charges were dropped and

the present action was brought directly afterwards, that the mother gained entry into Dyslin's apartment with the aid of two children, and that no known blood test exists by which to prove conclusively one's fatherhood is not dispositive of the paternity issue. The most important evidentiary considerations relate to the question of Dyslin's access to the mother on January 27, 1979, the date of conception.

Dyslin failed to establish with any degree of certainty that he was not in Illinois on the date of conception. His contentions that he was not in the Chicago area and did not have access to the mother on January 27, 1979, were not, as the family court found, "completely corroborated by the testimony of ... Al Duff and his wife, Linda Duff." Dyslin lived with the Duffs in Myrtle Beach, South Carolina, during the first five months of 1979. He and Al Duff were business associates at the time. Neither Al nor Linda Duff could account for Dyslin's whereabouts on January 27, 1979, and they could not unequivocally say that Dyslin was not in Illinois on that date as he claimed.

The testimony of Dyslin's wife also deserves comment, albeit limited. She likewise failed to corroborate Dyslin's statements about nonaccess to the mother. The wife testified that she telephoned and talked with Dyslin in Myrtle Beach from Illinois on January 25, 29, and 31, 1979. In fact, a telephone bill introduced through her reflects long distance calls being made to a Myrtle Beach telephone number on those dates; however, the bill does not disclose who placed the calls, to whom the calls were made, and the purpose of the calls. At any rate, Dyslin's wife conceded she did not know "what he did" on January 27, 1979.

Completely ignored by the family court were an admission from Dyslin that he has made lengthy long distance telephone calls to the mother since the child's birth and an acknowledgement from Dyslin that on a note dated July 1, 1980, and addressed to the mother, his signature follows the affectionate close, "Love." That evidence disputes his assertion that an affair which began in an Illinois bar in 1976 and involved frequent acts of carefree sexual intercourse ended "sometime in 1976."

Accordingly, we reverse and remand the case to the family court for a determination of appropriate child support.

Reversed and remanded.

SHAW and CURETON, JJ., concur.